# United States Court of Appeals

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

November 06, 2007

Clarence  Maddox
Clerk, U.S. District Court
301 N MIAMI AVE STE 150
MIAMI  FL  33128-7788

FILED by _____ H. H. ____ U.S.
APPEALS

NOV 1 3 2007

CLARENCE  MADDOX
CLERK  U.S.  DIST.  CT.
S.D. OF FLA.  MIAMI

**Appeal Number: 04-13575-EE**
Case Style: Steven I. Weissman v. National Association
District Court Number:  03-61107 CV-WJZ

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 04-13575

District Court Docket No.
03-61107-CV-WJZ

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Sep 18, 2007

THOMAS K. KAHN
CLERK

STEVEN I. WEISSMAN, as Custodian under the
Florida Uniform Transfers to Minors Act,
as Trustee and individually,

Plaintiff-Appellee,

versus

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.,
a Delaware not for profit corporation,
NASDAQ STOCK MARKET, INC., a Delaware corporation
organized for profit,

Defendants-Appellants.

A True Copy - Attested
Clerk U.S. Court of Appeals
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

Appeal from the United States District Court
for the Southern District of Florida

---

J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
NOV 0 6 2007
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:    September 18, 2007
For the Court:   Thomas K. Kahn, Clerk
By:    Jackson, Jarvis

WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS     3683

ORIGINAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

SEP 1 8 2007

THOMAS K. KAHN
CLERK

Steven I. WEISSMAN, as Custodian under the Florida Uniform Transfers to Minors Act, as Trustee and individually, Plaintiff–Appellee,

v.

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. a Delaware not-for-profit corporation, NASDAQ Stock Market, Inc., a Delaware corporation organized for profit, Defendants–Appellants.

No. 04-1875.

United States Court of Appeals, Eleventh Circuit.

Sept. 18, 2007.

**Background:** Investor sued National Association of Securities Dealers (NASD) and NASDAQ stock market, alleging that defendants had actively promoted particular stock, purchased by investor, that later suffered precipitous decline due to fraud, and asserting state-law claims including statutory and common-law fraud. The United States District Court for the Southern District of Florida, No. 03-61107-CV-WJZ, 2004 WL 3395190, William J. Zloch, Chief Judge, denied defendants' motion to dismiss, and they appealed. The Court of Appeals, 468 F.3d 1306, affirmed in part and reversed in part.

**Holding:** On rehearing en banc, the Court of Appeals, Barkett, Circuit Judge, held that defendants were not entitled to absolute immunity against investor's fraud claims arising from NASDAQ's marketing and advertising.

Affirmed.

Pryor, Circuit Judge, filed opinion concurring in part and dissenting in part joined by Circuit Judges Black, Marcus and Wilson.

Tjoflat, Circuit Judge, filed dissenting opinion.

**1. Federal Courts** ⟲776, 794, 797

Court of Appeals reviews *de novo* district court's denial of motion to dismiss on basis of immunity, construing all inferences to be drawn therefrom in light most favorable to plaintiff, and accepting all well-pleaded factual allegations as true.

**2. Evidence** ⟲96(1)

Party claiming immunity from suit bears burden of proof on that issue.

**3. Securities Regulation** ⟲40.15

Under Securities Exchange Act, self-regulatory organizations (SROs) are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions; however, SROs do not enjoy absolute immunity when they perform non-governmental functions. Securities Exchange Act, § 3(a)(26), 15 U.S.C.A. § 78c(a)(26).

**4. Securities Regulation** ⟲40.15

Under Securities Exchange Act, self-regulatory organization's (SRO) absolute immunity for performance of statutorily delegated functions is narrowly construed. Securities Exchange Act, § 3(a)(26), 15 U.S.C.A. § 78c(a)(26).

**5. Securities Regulation** ⟲40.15

Under Securities Exchange Act, objective test applies in determining whether self-regulatory organization's (SRO) conduct is quasi-governmental, and thus protected by absolute immunity; nature and function of activity for which immunity is sought, not SRO's subjective intent or motivation, is de-

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2007 Thomson/West

The Synopsis, Headnotes and Key Number Classification constitute no part of the opinion of the court.

3684    WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS

terminative. Securities Exchange Act, § 3(a)(26), 15 U.S.C.A. § 78c(a)(26).

**6. Exchanges ⬩12.1**

**Securities Regulation ⬩40.15**

National Association of Securities Dealers (NASD) and its subsidiary stock exchange, NASDAQ, were not entitled to absolute immunity against investor's state-law fraud claims arising from NASDAQ marketing and advertising that promoted particular stock listed on NASDAQ, including newspaper advertisement touting fact that companies listed on NASDAQ had to satisfy rigorous financial standards; marketing and advertising in question constituted for-profit commercial activity, and was devoid of any quasi-governmental adjudicatory, regulatory or prosecutorial functions. Securities Exchange Act, §§ 3(a)(26), 15A(b)(6), 15 U.S.C.A. §§ 78c(a)(26), 78o-3(b)(6).

———

Appeal from the United States District Court for the Southern District of Florida.

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and PRYOR, Circuit Judges.

BARKETT, Circuit Judge:

The National Association of Securities Dealers, Inc. and its subsidiary, the NASDAQ Stock Market, Inc. (collectively "NASDAQ"), appeal the denial of their Rule 12(b)(6) motion to dismiss Steven Weissman's complaint. Weissman sought to recover losses suffered following the purchase of WorldCom, Inc. ("WorldCom") stock, which Weissman allegedly purchased in reliance on NASDAQ's misrepresentations in advertise-

ments touting the stock. NASDAQ moved to dismiss, asserting absolute immunity from suit on the grounds that the conduct alleged in the complaint was undertaken pursuant to its quasi-governmental role as a market regulator under the Securities Exchange Act (SEA), 15 U.S.C. § 78a *et seq.* The district court rejected this contention, explaining that while NASDAQ does enjoy absolute immunity for statutorily-delegated regulatory or disciplinary functions, it is not entitled to immunity in this case because Weissman's complaint relates to private commercial conduct not delegated by the Act. We affirm the decision of the district court.

BACKGROUND

Between December 2000 and June 2002, Weissman purchased 82,800 shares of WorldCom stock on behalf of his minor children. In the wake of WorldCom's collapse, and after losing almost the entire investment, Weissman filed a diversity suit in federal district court against NASDAQ. In his complaint, Weissman disavowed any reliance on NASDAQ's regulatory activity as the basis for his suit, emphasizing that "[t]his action is based *solely* on the for-profit commercial business activity of the Defendants [, . . .] includ[ing] Defendants' approximately $100 million . . . marketing and advertising campaign during the years 2000, 2001 and 2002 to promote and sell . . . shares of WorldCom, Inc."

Weissman claimed that NASDAQ violated Fla. Stat. § 517.301(1)(b) by promoting WorldCom through its marketing and advertising without disclosing that its revenues were directly enhanced by increased trading in WorldCom stock; offered WorldCom shares for sale without registering as a broker, in violation of Fla. Stat. § 517.12; and committed common law fraud and/or negli-

gent misrepresentation in its attempts to induce investors to purchase shares of World-Com.

In addition to its claim of absolute immunity, NASDAQ alternatively moved to dismiss the complaint on the grounds that Weissman lacked a federal private right of action, failed to exhaust his administrative remedies, and failed to state a cause of action under Florida law. The district court denied the motion in all respects.[1] NASDAQ timely appealed. Weissman moved to dismiss the appeal for lack of jurisdiction. We granted that motion in part, dismissing NASDAQ's assertions that Weissman failed to adequately plead his state law claims and did not exhaust his administrative remedies. *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 04–13575 (11th Cir. Oct. 13, 2004). However, we permitted the appeal to proceed as to the district court's denial of NASDAQ's motion to dismiss premised on absolute immunity, as well as its claim that Weissman lacked a federal private right of action.[2] *Id.* After oral argument, a panel of this court reversed the district court's denial of absolute immunity with regard to those portions of Weissman's complaint that involve NASDAQ's "dissemination of WorldCom's fraudulent financial statements," but affirmed the denial of absolute immunity with regard to the re-

mainder of Weissman's complaint, specifically, allegations of misrepresentation relating to NASDAQ's promotion of WorldCom stock. *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 468 F.3d 1306 (11th Cir.2006), (vacated and reh'g en banc granted, *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 481 F.3d 1295 (11th Cir.2007)).

We later vacated the panel opinion and granted rehearing en banc to address the question of whether a self-regulatory organization ("SRO"), such as NASDAQ, enjoys absolute immunity for the advertisements described in the complaint in this case. *See Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 481 F.3d 1295 (11th Cir.2007) (vacating panel opinion and granting rehearing en banc). We now consider that question en banc and affirm the district court's determination that NASDAQ does not enjoy immunity for the conduct alleged.[3]

## STANDARD OF REVIEW

[1, 2] We review *de novo* the district court's denial of a motion to dismiss on the basis of immunity, construing all inferences to be drawn therefrom in the light most favorable to the plaintiff and accepting all well-pleaded factual allegations as true. *See Maggio v. Sipple*, 211 F.3d 1346, 1350 (11th

---

1. Specifically, the district court held that both the absence of a federal private right of action, as well as any failure to exhaust SEC remedies, were immaterial because all of Weissman's claims were based solely on state law. It further held that, because NASDAQ's enjoyment of absolute immunity for quasi-governmental activity does not insulate it from suit for activity related to private business, its alleged advertisement and promotion of WorldCom was outside the scope of such immunity.

2. Thus, any contention that Weissman's complaint fails to state a cause of action is not before us.

3. Because the en banc panel considered only this narrow issue, we hereby reinstate the original panel's determinations denying Weissman's motion for attorneys' fees and double costs; reversing the trial court's denial of absolute immunity for the portions of Weissman's complaint involving NASDAQ's "dissemination of WorldCom's fraudulent financial statements"; and finding no error in the trial court's conclusion that the absence of a federal private right of action was immaterial in this case. *See Weissman v. Ass'n of Sec. Dealers, Inc.*, 468 F.3d 1306 (11th Cir.2006) (vacated and reh'g en banc granted, *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 481 F.3d 1295 (11th Cir.2007)).

**3686**          WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS

Cir.2000); *see also Buckley v. Fitzsimmons,* 509 U.S. 259, 261, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (assuming allegations in complaint to be "entirely true" for purposes of determining absolute immunity). Moreover, a party claiming immunity from suit bears the burden of proof. *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

## DISCUSSION

Under the Securities Exchange Act of 1934, Congress established a system of regulation over the securities industry, which relies on private, self-regulatory organizations to conduct the day-to-day regulation and administration of the United States' stock markets, under the close supervision of the United States Securities and Exchange Commission ("SEC"). The SEC authorized NASD to delegate its SRO functions to NASDAQ for operating and maintaining the NASDAQ stock market. *See* SEC Release No. 34–39326, *Order Approving the Plan of Allocation and Delegation of Functions by NASD to Subsidiaries,* 62 Fed.Reg. 62,385 (Nov. 21, 1997). Thus, NASDAQ serves as an SRO within the meaning of the Securities Exchange Act, 15 U.S.C. § 78c(a)(26), which vests it with a variety of adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws; promulgating and enforcing rules governing the conduct of its members; and listing and de-listing stock offerings. *See* 15 U.S.C. §§ 78c(a)(26), 78f(b), 78s(g); 15 U.S.C. § 78f(d); 59 Fed. Reg. 29834, 29843 (1994). At the same time, as a private corporation, NASDAQ may en-

gage in a variety of non-governmental activities that serve its private business interest such as its efforts to increase trading volume and company profit, as well as its daily administration and management of other business affairs. Indeed, even though the SEC has explicitly delegated regulatory functions to SROs, the SEC itself is mindful that SROs have dual status as both quasi-regulators and private businesses.[4]

[3] Because they perform a variety of vital governmental functions, but lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions. *See Barbara v. New York Stock Exch.,* 99 F.3d 49, 59 (2d Cir. 1996); *Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 757 F.2d 676, 692 (5th Cir.1985); *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1215 (9th Cir.1998); *Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.,* 80 F.3d 559, 559 (D.C.Cir.1996). However, entities that enjoy absolute immunity when performing governmental functions cannot claim that immunity when they perform non-governmental functions. For example, municipal corporations may enjoy the same level of immunity as the government itself when "acting in their governmental capacity .... When, however, they are not acting in the exercise of their purely governmental functions, but are performing duties that pertain to the exercise of those private franchises, powers, and privileges which belong to them for their own corporate benefit, ... then a different rule of

---

**4.** The SEC has stated explicitly that "[a]s competition among markets grows, the markets that SROs operate will continue to come under increased pressure to attract order flow. This business pressure can create a strong conflict between the SRO regulatory and market operations functions." SEC Release No. 34–50700, *Concept Release Concerning Self-Regulation,* 69 Fed.Reg. 71,256, 71,261–262 (Dec. 8, 2004).

liability is applied and they are generally held responsible for injuries arising from their negligent acts or their omissions to the same extent as a private corporation under like circumstances." *Owen v. City of Independence,* 445 U.S. 622, 645 n. 27, 100 S.Ct. 1398, 63 L.Ed.2d 673 (quoting W. Williams, *Liability of Municipal Corporations for Tort* § 4, at 9 (1901)). The dual nature of SROs as private companies that carry out governmental functions is similar to that of municipal corporations.

Thus, "[t]o be sure, self-regulatory organizations do not enjoy complete immunity from suits." *Sparta,* 159 F.3d at 1214. Only when an SRO is "acting under the aegis of the Exchange Act's delegated authority" does it enjoy that privilege. *Id.* Absolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function. *See D'Alessio v. New York Stock Exch., Inc.,* 258 F.3d 93, 105 (2d Cir. 2001) ("a[n] SRO, such as the [New York Stock Exchange], may be entitled to immunity from suit for conduct falling *within the scope of the SRO's regulatory and general oversight functions*") (emphasis added); *see also Austin,* 757 F.2d at 692 ("NASD is entitled to absolute immunity for its role in disciplining its members and associates."); *Barbara,* 99 F.3d at 59 (absolute immunity granted in suit arising from disciplinary action against employee of exchange member); *Sparta,* 159 F.3d at 1215 (holding that decision to suspend trading was "a regulatory function cloaked in immunity").

[4, 5] Furthermore, because the law favors providing legal remedy to injured parties, grants of immunity must be narrowly construed; that is, courts must be "careful not to extend the scope of the protection further than its purposes require." *Forres-*

*ter v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *see also Owen,* 445 U.S. at 645 n. 28, 100 S.Ct. 1398 (1980) (citations omitted). Thus, because immunity is appropriate only when an SRO is performing regulatory, adjudicatory, or prosecutorial functions that would otherwise be performed by a government agency, it follows that absolute immunity must be coterminous with an SRO's performance of a governmental function. When an SRO is not performing a purely regulatory, adjudicatory, or prosecutorial function, but rather acting in its own interest as a private entity, absolute immunity from suit ceases to obtain. To determine whether an SRO's conduct is quasi-governmental, we look to the objective nature and function of the activity for which the SRO seeks to claim immunity. The test is not an SRO's subjective intent or motivation, *Bogan v. Scott–Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (noting that the question of whether absolute immunity for a legislative act applies "turns on the nature of the act, rather than on the motive or intent" of the party performing the act), although there may be some correlation between motive and intent and the function being performed.

[6] NASDAQ suggests that, because it serves important regulatory functions, we should adopt a rule that would find an SRO absolutely immune for all activity that is "consistent with" its powers and functions under the Exchange Act and SEC regulations. Under NASDAQ's view, even advertisements that promote the sale of a particular stock and serve no regulatory function whatsoever would be shielded by absolute immunity, because advertisements are "consistent with" NASDAQ's role as an SRO. In urging this broad test, NASDAQ argues that it is the standard followed by the Second

**3688**      **WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

Circuit in *D'Alessio* and that we should follow its holding. We find this argument unavailing. First, *D'Alessio* does not address the kind of conduct at issue in this case. The court in *D'Alessio* granted absolute immunity to an SRO where the complaint in that case dealt with allegations of "improper performance of its interpretive, enforcement and referral functions" in connection with the suspension of a broker—a core regulatory responsibility delegated to SROs by the SEC. *D'Alessio*, 258 F.3d at 105–106. Second, NASDAQ imperfectly represents the language of *D'Alessio* in order to arrive at the "consistent with" test it urges. While it is true that *D'Alessio* held that an SRO "is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it . . . ," it made clear that this is true only when an SRO is "*acting in its capacity as a[n] SRO.*" *D'Alessio*, 258 F.3d at 106 (emphasis added). Thus, contrary to NASDAQ's assertions, *D'Alessio* did not apply this test "*whenever*" SROs engage in conduct that is simply "consistent with" their powers. (NASDAQ's Reply Brief p. 16) (emphasis added).

Indeed, every case that has found an SRO absolutely immune from suit has done so for activities involving an SRO's performance of regulatory, adjudicatory, or prosecutorial duties in the stead of the SEC. *See Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213–15 (9th Cir.1998) (decision to suspend trading and delist shares of a company); *D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 104–06 (2d Cir.2001) (disciplinary decision banning trader from the NYSE floor); *Barbara v. New York Stock Exch., Inc.*, 99 F.3d 49, 58–59 (2d Cir.1996) (conduct in carrying out disciplin-

ary decision); *DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97–100 (2d Cir.2005) (decision to suspend trading of a security, to cancel certain trades, and to announce these actions); *Dexter v. Depository Trust & Clearing Corp.*, 406 F.Supp.2d 260, 263–64 (S.D.N.Y.2005), *aff'd*, 219 Fed. Appx. 91 (2d Cir.2007) (decision setting an ex-dividend date). Therefore, we find *D'Alessio* inapplicable and hereby reject a standard that would grant SROs absolute immunity for all activity that is merely "consistent with" their delegated powers.

Thus, we now turn to Weissman's complaint to examine the nature and function of NASDAQ's actions as alleged therein. The complaint alleges the following conduct:

> NASDAQ[5] touted, marketed, advertised and promoted WorldCom, falsely representing it as a good company and worthwhile investment and disseminating its fraudulent financial statements, without revealing that, *inter alia:*
>
> (i) Defendants were engaged in a partnership with WorldCom to promote the sale of its securities in order to generate trading volume and income for the Defendants;
>
> (ii) Defendants did not review the fraudulent WorldCom financial statements which they disseminated, thus assisting in the perpetration of the largest corporate fraud in the U.S. history;
>
> (iii) Defendants directly and indirectly profited from the sale of WorldCom Shares to Plaintiff; [and]
>
> (iv) WorldCom was not in compliance with N[ASDAQ] listing requirements . . . . (Complaint ¶ 12)

5.   The complaint frequently refers to NASDAQ as the "The For Profit." For the sake of clarity and consistency, when citing the complaint, this opinion will in each instance render "The For Profit" as NASDAQ.

In purchasing shares of WorldCom, Plaintiff relied on NASDAQ's advertising, which repetitively advertised WorldCom as a "successful growth company". For example, appearing in major prime time programming such as West Wing and MSNBC News with Brian Williams, NASDAQ ran TV spots for its 100 Index Trust, better known as the QQQ .... The ads feature a group of companies included in the trust, specifically including and showing WorldCom. The key message is that the world's most successful, sought after companies, can be found on the N[ASDAQ] stock market. (Complaint ¶ 61)

Seeking to calm the markets in the wake of Enron fraud, on April 11, 2002, NASDAQ took out a two full page spread advertisement in the Wall Street Journal discussing its belief in the need for N[AS-DAQ] listed companies to provide accurate financial reporting in accordance with Generally Accepted Accounted Principals ("GAAP"), "supported by a Knowledgeable Audit Committee". On one page is a picture of the N[ASDAQ] ticker with the slogan "The Responsibilities We All Share". On the opposite page under the headline "Keeping Our Markets True—It Is All About Character" is a list of the chief executives of the "good" N[ASDAQ] listed companies under the sub-heading "Our Beliefs Stand In Good Company". Listed thereunder as an endorser of these N[ASDAQ] goals is "Bernard J. Ebbers, President and Chief Executive Officer WorldCom, Inc." The message implicitly conveyed by the ad is that WorldCom and its CEO are endorsed by NASDAQ as, inter alia, having good character, accounting done in accordance with GAAP, and a viable audit committee in accordance with N[ASDAQ] listing requirements. Plaintiff relied on this endorsement the following day in purchasing yet additional shares of WorldCom as its price continued on a downward spiral. (Complaint ¶ 62; see also Complaint ¶ 96).

As noted earlier, in deciding whether NASDAQ is entitled to absolute immunity, we look to the nature and function of NASDAQ's actions as alleged in the complaint. We can find no quasi-governmental function served by the advertisements here. The allegations do not relate to NASDAQ's statutorily delegated responsibility to "prevent fraudulent and manipulative ... practices," "promote just and equitable principles of trade," "remove impediments to and perfect" the free market, or "protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6). The particular advertisements alleged by the complaint were in no sense coterminous with the regulatory activity contemplated by the Exchange Act. This conduct was private business activity, and "[w]hen conducting private business, [SROs] remain subject to liability." Sparta, 159 F.3d at 1214. NASDAQ represents no one but itself when it entices investors to trade on its exchange and, specifically, when it suggests that particular companies are sound investments.

As a private corporation, NASDAQ places some advertisements that by their very nature serve the function of promoting certain stocks that appear on its exchange in order to increase trading volume and, as a result, company profits. Even if NASDAQ's status as a money-making entity does not foreclose absolute immunity for any number of its activities, its television and newspaper advertisements cannot always be said to directly further its regulatory duties under the Securities Exchange Act. These advertisements—by their tone and content—were in the service of NASDAQ's own business, not the government's, and such distinctly non-

**3690**      **WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

governmental conduct is not protected by absolute immunity.

Because we conclude that NASDAQ's advertising activity alleged in this case does not serve an adjudicatory, regulatory, or prosecutorial function, the district court's denial of absolute immunity to NASDAQ for the advertisements described in this case is

AFFIRMED.

PRYOR, Circuit Judge, concurring in part and dissenting in part, in which BLACK, MARCUS and WILSON, Circuit Judges, join:

I concur in the majority opinion with one exception, from which I respectfully dissent. My disagreement is with the majority's conclusion that the allegations about the advertisement in *The Wall Street Journal* do not describe quasi-governmental conduct shielded by absolute immunity. That advertisement communicated to investors that companies listed on NASDAQ must satisfy rigorous financial standards. Because the establishment of those standards was a duty delegated to NASDAQ by the SEC, NASDAQ is entitled to absolute immunity for its communication of those standards to investors.

Because SROs "stand[ ] in the shoes of the SEC ... [,][i]t follows that [they] should be entitled to the same immunity enjoyed by the SEC when [they] perform functions delegated to [them] under the SEC's broad oversight authority," *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir.2001), but not "[w]hen [they] conduct private business," *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir.1998). As the majority correctly concludes, "absolute immunity [is] coterminous with an SRO's performance of a governmental function." *Ante* at 3687. The proper

inquiry is whether the conduct performed a function delegated by the SEC.

The majority also rightly explains that "[t]he test is not an SRO's subjective intent or motivation." *Id.* at 3687. "It is, after all, hard to imagine the plaintiff ... who would—when otherwise wronged by an SRO but unable to seek money damages—fail to concoct some [subjective intent] in order to try and circumvent the absolute immunity doctrine." *DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir.2005). It is irrelevant whether the alleged conduct was intended, as the majority implies, "to increase trading volume and, as a result, company profits." *Ante* at 3689.

Our task is to assess whether the alleged conduct, read objectively, is quasi-governmental. Because our inquiry is objective, we evaluate how the reasonable reader would understand the alleged conduct of an SRO. We then determine whether that conduct, so understood, advanced a delegated governmental function. We also view the allegations from the perspective of the reasonable reader because we make only reasonable inferences from the facts alleged in the complaint.

We look at both the actions taken by the SRO and the alleged context in which those actions occurred. Context is important because it influences the reasonable reader. A reasonable reader, for example, would understand an alleged shout of "Fire!" to mean one thing if the exclamation were alleged to have been made in front of a burning building and another thing if it were alleged to have been made at a shooting range. At the same time, we must be careful not to allow our consideration of context to lead us to speculate about the motivations or intent of an SRO.

As the majority explains, Weissman alleged that NASDAQ "touted, marketed, ad-

vertised and promoted WorldCom," and Weissman described specific television and newspaper advertisements by NASDAQ upon which he allegedly relied to his detriment. *Ante* at 3688–89. The majority asserts that Weissman's allegations do not describe conduct protected by absolute immunity, but the majority fails to explain its analysis of Weissman's allegations. We are left to wonder how the majority evaluates each of the advertisements that are the subject of Weissman's complaint.

When I consider Weissman's allegations, I reach two different conclusions about the advertisements he describes. First, Weissman's allegations about the advertisement in *The Wall Street Journal* describe conduct that was objectively quasi-governmental and is shielded by absolute immunity. Second, Weissman's allegations about the television advertisements of NASDAQ describe its private business, which is not shielded by absolute immunity.

According to Weissman, the advertisement in *The Wall Street Journal* "discuss[ed] ... the need for N[ASDAQ] listed companies to provide accurate financial reporting in accordance with Generally Accepted Accounting Princip[le]s ('GAAP'), 'supported by a Knowledgeable Audit Committee.'" The advertisement included "the slogan 'The Responsibilities We All Share'" and "the headline 'Keeping Our Markets True—It Is All About Character.'" It printed, "as ... endorse[rs] of these N[ASDAQ] goals," the names of CEOs of some of the companies listed on the stock exchange. Among the names was Bernard J. Ebbers, identified as the CEO of WorldCom. I also accept as true, as Weissman alleged, that NASDAQ published the advertisement on April 11, 2002, "in the wake of the Enron fraud." Because the subjective motivation of NASDAQ is irrelevant, I do not consider Weissman's assertion that NAS-

DAQ intended "to calm the markets" by publishing the advertisement.

A reasonable reader would understand the alleged content of the advertisement as a communication to the investing public that companies listed on NASDAQ must satisfy rigorous financial standards. A reasonable reader would understand the alleged reference to WorldCom, which is Weissman's true grievance, as a communication to the investing public that WorldCom was listed on the exchange and met the described requirements. The alleged statements in the newspaper advertisement are no different from an announcement of listing requirements or decisions on the NASDAQ website or in a NASDAQ press release.

Contrary to the conclusion of the majority, the allegations about the content of the advertisement in *The Wall Street Journal* describe an action by NASDAQ that objectively advanced delegated governmental functions. Decisions by NASDAQ to list or delist securities are among its delegated regulatory duties "to prevent fraudulent and manipulative acts and practices, ... promote just and equitable principles of trade, ... perfect the mechanism of a free and open market and a national market system, and, in general, ... protect investors and the public interest." 15 U.S.C. § 78o–3(b)(6); *see also Sparta Surgical*, 159 F.3d at 1214–15 (holding NASDAQ absolutely immune for the "quintessentially regulatory" decision to delist and suspend trading of a particular security). Communication of those listing requirements and decisions, as occurred in *The Wall Street Journal*, is no less quasi-governmental. *See DL Capital Group*, 409 F.3d at 98 ("[A]nnouncing the suspension or cancellation of trades is as much a part of [the] regulatory duties as is the actual suspension or cancellation of trades."). Like the dissemination by

3692    WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS

NASDAQ of WorldCom financial statements, which the majority agrees is protected by absolute immunity, *ante* at 3685 n. 3, the communication in *The Wall Street Journal* "at the very least ... [was] undertaken pursuant to NASDAQ's regulatory authority 'to remove impediments and perfect' the free market." *Weissman v. Nat'l Ass'n of Sec. Dealers*, 468 F.3d 1306, 1311 (11th Cir.2006) (quoting 15 U.S.C. § 78o–3(b)(6)), *vacated*, 481 F.3d 1295 (11th Cir.2007).

The alleged context of the newspaper advertisement further proves that the advertisement objectively advanced delegated governmental functions. Weissman alleges that, when NASDAQ published its advertisement in *The Wall Street Journal*, a recent financial scandal had undermined public confidence in the market. In the light of the Enron scandal, a reasonable reader of Weissman's complaint would understand the advertisement as a communication of the integrity and fidelity of the market. Such a communication is part of the regulatory duties of NASDAQ to "perfect the mechanism of a free and open market and a national market system, and, in general, ... protect investors and the public interest." 15 U.S.C. § 78o–3(b)(6).

By contrast, Weissman's few allegations about the television advertisements of NASDAQ do not describe conduct that objectively advanced delegated governmental functions. According to Weissman, NASDAQ "ran TV spots for its 100 Index Trust, better known as QQQ." The advertisements began the week of September 24, 2001, and "feature[d] a group of companies included in the trust, specifically including and showing World-Com." Weissman asserted that the "key" subjective message was "that the world's most successful, sought after companies, can be found on the N[ASDAQ] stock market."

The 100 Index Trust, or QQQ, is a "'bundled' investment option." The trust is a weighted blend of the 100 companies listed on NASDAQ that have the largest market capitalizations with the exception of banks and broker-dealers. An investor who purchases a share of QQQ has bought a piece of the trust. NASDAQ employs a formula, ordinarily on an annual basis, to generate the list of 100 companies.

A reasonable reader would understand the alleged advertisements as promoting the QQQ trust and explaining, as part of that promotion, that certain companies, such as WorldCom, were included in the trust. When taken in the light most favorable to Weissman, it is also reasonable to read the vague allegation that the advertisements "feature[d]" WorldCom as describing conduct that touted WorldCom. Unlike the communication of listing requirements and decisions in *The Wall Street Journal*, the express promotion or touting by NASDAQ of a particular stock fund or stock on the exchange does not perform any statutorily delegated governmental function. *See* 15 U.S.C. § 78o–3(b)(6). Although these advertisements allegedly aired soon after the terrorist attack on September 11, 2001, a reasonable reader would not understand the allegations to describe anything but private business. I agree with the majority that Weissman's allegations about the television advertisements of NASDAQ describe its private business and do not describe conduct that is entitled to absolute immunity.

NASDAQ argues that the express promotion or touting of a particular stock fund or stock advances a delegated governmental function. NASDAQ contends that this conduct invites investors to trade on its market, which furthers its regulatory duty "to remove impediments to and perfect the mechanism of a free and open market." *Id.* The

WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS          3693

problem with the argument of NASDAQ is that it depends on such a broad understanding of the regulatory duty to perfect the market that any conduct of NASDAQ would be considered quasi-governmental and shielded by absolute immunity. We extend absolute immunity to SROs only when they "stand[ ] in the shoes of the SEC." *D'Alessio*, 258 F.3d at 105. Because the SEC would not promote or tout a particular stock fund or stock, NASDAQ is not entitled to absolute immunity when it does so.

It is a separate question whether Weissman's sparse allegations about the television advertisements are enough to state a claim for relief. Although that issue is not before us, the district court may want to consider that the Supreme Court recently abrogated its oft-quoted observation that " 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. ——, 127 S.Ct. 1955, 1968, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The Supreme Court rejected the notion that "a wholly conclusory statement of claim [can] survive a motion to dismiss whenever the pleadings le[ave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* Whether Weissman's allegations about the bare mention of WorldCom in the television advertisements for the QQQ trust state a claim for relief, in the light of *Twombly*, may need to be revisited by the district court.

Although advertisements that promoted or touted certain stocks do not come within the scope of absolute immunity, advertisements that performed governmental functions deserve absolute immunity. The majority's de-

cision to expose NASDAQ to liability for its use of *The Wall Street Journal* to communicate its listing requirements will impede the ability of NASDAQ and other SROs to discharge their delegated duties and engage in "forceful self-regulation of the securities industry." *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 59 (2d Cir.1996). The majority opinion creates a disincentive to use *The Wall Street Journal* and other media outlets to disseminate regulatory information, such as notices of the suspension or resumption of trading. Even in this internet age, print and television advertisements remain robust methods of communicating with the investing public. After this decision, SROs will be chilled in communicating with the public about the performance of their regulatory responsibilities. I would reverse the denial by the district court of absolute immunity to NASDAQ for the advertisement in *The Wall Street Journal* that Weissman alleged in his complaint.

TJOFLAT, Circuit Judge, dissenting:

The majority and I agree on a great deal about this appeal. We do not question that absolute immunity protects NASDAQ from suit for its quasi-governmental activities. We agree that *de novo* review applies here and, at least in theory, that all well pleaded factual allegations in the complaint and any reasonable inferences therefrom are to be drawn in the plaintiff's favor. We even seem to agree generally on which allegations in the complaint are determinative of this appeal.

Despite all that concordance, we disagree fundamentally on whether this complaint's allegations pertaining to advertisements are sufficient to overcome NASDAQ's absolute immunity from suit. As best I can tell from the majority's short and puzzling opinion, our difference turns primarily on the application

**3694**     WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS

of relevant pleading principles to those allegations. I respectfully dissent.[1]

## I.

As many immunity cases do, this case boils down largely to a question of pleading. Immunity determinations give rise to special concerns upon a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), as they bring into tension the policy requiring that immunity defenses be resolved "as early as possible" and the liberal notice pleading standard under Rule 8. *See GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir.1998) ("Rule 8 requires that federal courts give pleadings a liberal reading in the face of a 12(b)(6) motion to dismiss."); *Marx v. Gumbinner*, 855 F.2d 783, 788 (11th Cir.1988), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478, 496, 111 S.Ct. 1934, 1944–45, 114 L.Ed.2d 547 (1991); *Elliott v. Perez*, 751 F.2d 1472, 1482 (5th Cir.1985) (Higginbotham, J., concurring) (describing the "exquisite confrontation" between immunity defenses and notice pleading concerns); *cf. Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022 (11th Cir.2001) (en banc) ("The Supreme Court has urged us to apply

the affirmative defense of qualified immunity at the earliest possible stage in litigation because the defense is immunity from suit and not from damages only.").

A motion to dismiss on immunity grounds requires us to accept as true all well pleaded facts and draw all reasonable inferences therefrom in the light most favorable to the plaintiff, so once an immunity defense is advanced, the plaintiff's specific allegations relevant to that defense take on "great importance." *See Marsh*, 268 F.3d at 1022. Yet Rule 8(a), by its text, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so that a plaintiff's allegations need only be sufficiently detailed—at least for the purpose of stating an adequate claim on the merits—to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. ——, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, we have a pleading regime that appears to require minimal allegations of fact, but, at the same time, our assessment of a motion to dismiss on immunity grounds de-

---

1. I understand the court's en banc decision today to be reinstating the original panel's decisions on all issues other than NASDAQ's immunity for the advertisements described in Weissman's complaint. This includes a reinstatement of the original panel's unanimous decision that NASDAQ is entitled to immunity with regard to the allegations that it "disseminat[ed] WorldCom's fraudulent financial statements" on the NASDAQ internet web site. I concur in these small particulars; my dissent is from the majority's decision with regard to the advertisements, which is the sole issue considered by the court on rehearing en banc.

Moreover, in addition to the thoughts I express in dissent today, I adhere to much of my opinion in the vacated panel decision of this case, 468 F.3d 1306, 1313–21 (11th Cir.2006) (Tjoflat, J., concurring in part and dissenting in part). In

my view, the en banc court's decision today adds little to the original panel majority's cursory analysis. This is a shame, for while I disagree with the majority's position, I believe there is more to be said if the court wishes to hand down a decision that does more than announce a result. The majority does go to some lengths to discredit the suggestion that an SRO is immune for any activity "consistent with" its quasi-governmental functions. *Ante* at 3687–89. In my separate panel opinion, I implicitly suggested that a "consistency" standard had some applicability, but I do not here opine on the matter, as I do not think it necessary. I continue to believe, as I stated in my separate panel opinion, that the advertising content complained of here ultimately communicates a listing decision, one of the quintessential regulatory activities for which an SRO enjoys immunity from suit.

pends entirely upon whatever few facts are alleged. *See Marx*, 855 F.2d at 789 (noting the "case-by-case" nature of immunity determinations). Courts must take great care in considering immunity defenses to ensure that neither of these somewhat antagonistic, but equally potent, concerns is allowed to eclipse the other.

In my view, the majority skews too far in favor of liberal pleading concerns in its treatment of Weissman's complaint, giving his allegations far too much deference. Two familiar principles impose practical limits on our acceptance of a plaintiff's allegations upon a motion to dismiss on the ground of absolute immunity.

First, and I need hardly dwell on this point, it is beyond dispute that we take only *well pleaded* factual allegations as true, and we draw only *reasonable* inferences in favor of the plaintiff. *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992); *Marrero v. City of Hialeah*, 625 F.2d 499, 502 (5th Cir.1980); *see also Long v.*

*Satz*, 181 F.3d 1275, 1278 (11th Cir.1999) (per curiam) ("reasonable inferences"); *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir.1974) (same).[2] This is true in all cases reviewing a motion to dismiss under Rule 12(b)(6). "[C]omplaints are not impregnable"; any conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts do not prevent dismissal. *Associated Builders, Inc.*, 505 F.2d at 99; *see also Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir.2002); *Marsh*, 268 F.3d at 1036 n. 16. The majority phrases the standard—in a somewhat muddled formulation—thusly: "We review *de novo* the district court's denial of a motion to dismiss on the basis of immunity, construing all inferences to be drawn therefrom in the light most favorable to the plaintiff and accepting all well-pleaded factual allegations as true." *Ante* at 3685. The majority's statement is, for all intents and purposes, correct (if perhaps abbreviated, given its failure to observe explicitly that all inferences must be reasonable).[3] Unfor-

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**3.** In support of its statement of the review standard, the majority cites to *Buckley v. Fitzsimmons*, 509 U.S. 259, 261, 113 S.Ct. 2606, 2609, 125 L.Ed.2d 209 (1993), for the proposition that a complaint's allegations must be assumed "entirely true" for the purpose of determining absolute immunity upon a motion to dismiss. Although the majority opinion does not elaborate, I trust it does not mean to suggest that *Buckley* made the standard of review on a motion to dismiss any less searching. Nothing about *Buckley* indicates that the Supreme Court intended to alter the standard for reviewing motions to dismiss. In fact, the *Buckley* decision barely discussed that standard at all, except to note at the outset its assumption that the *facts* pled in the complaint were true for the purposes of its review, given that the case was dismissed on a 12(b)(6) motion in the district court. *See id.* at

261, 264, 113 S.Ct. at 2609, 2611 (observing, in the next sentence after the "entirely true" language, that "[o]ur statement of *facts* is therefore derived entirely from petitioner's complaint and is limited to matters relevant to respondents' claim to absolute immunity." (emphasis added)).

In any event, this circuit has always treated *well pleaded* factual allegations as "entirely true"; only conclusory allegations and other similarly non-factual statements in a complaint are not credited. Nor does our subsequent circuit precedent reveal that *Buckley* worked any sea change to instate some new, more lenient "entirely true" standard that would require unqualified acceptance of conclusory allegations. *See, e.g., Rivera v. Leal*, 359 F.3d 1350, 1351, 1353 (11th Cir.2004) (citing *Buckley's* "entirely true" language as the standard for reviewing a complaint after a Rule 12(b)(6) dismissal, but going on to reject the plaintiff's conclusory allegation that a prosecutor was not absolutely immune because he was acting as an investigator and not an advocate); *Long*, 181 F.3d at 1278 (applying

**3696        WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

tunately, it is pure lip service; after stating the standard, the majority fails ever to examine Weissman's allegations with an eye toward determining whether they are conclusory or involve "unwarranted deductions." *See Oxford Asset Mgmt.*, 297 F.3d at 1188. I will say more about Weissman's specific allegations, and the majority's treatment of them, in part II, *infra*.

Second, the nature of the immunity analysis itself necessitates that we cast a searching eye upon those allegations in a complaint that are pertinent to an immunity defense. We must be ever mindful that absolute immunity is a substantive concern, and one that becomes meaningless if not effectuated as early as possible in the proceedings. *See Marx*, 855 F.2d at 788; *Elliott*, 751 F.2d at 1479 ("The public goals sought by official immunity are not procedural. Indeed, they go to very fundamental substantive objectives."), *abrogated in part on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Because absolute immunity exists "to shield officials from the distractions of litigation arising from the performance of their official functions," its protections are "effectively lost" if not applied vigorously to prevent a case from advancing to pretrial discovery or trial where appropriate. *See Brown v. Crawford County, Ga.*, 960 F.2d 1002, 1010 n. 12 (11th Cir.1992) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86

L.Ed.2d 411 (1985)); *Marx*, 855 F.2d at 788. Of course, absolute immunity is only to be applied to those limited "special functions requir[ing] a full exemption from liability," *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911–12, 57 L.Ed.2d 895 (1978), so we must carefully balance the individual's need for redress when injured and the equally important public need for certain critical, discretionary government functions to be performed free of the inhibiting influence of potential lawsuits. *See Forrester v. White*, 484 U.S. 219, 223–24, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988) (discussing the "undeniable tension between official immunities and the ideal of the rule of law").

In recognition of these concerns, the absolute immunity inquiry requires two steps. First, we must searchingly examine the complaint and identify the specific action that is alleged to have caused the plaintiff's injury. *See Burns*, 500 U.S. at 487, 111 S.Ct. at 1940 ("Initially, it is important to determine the *precise claim* that petitioner has made against respondent ...." (emphasis added)); *Marx*, 855 F.2d at 788–89 (discussing the importance of the factual allegations); *Marrero*, 625 F.2d at 505 ("[W]e begin by isolating the particular prosecutorial conduct of which appellants complain."). Then, we must determine as a matter of law whether the relevant action belongs among the subset of activities performed by the defendant that are of a character meriting heightened pro-

---

the traditional formulation of the standard of review).

   Additionally, the majority appends to its statement of the standard of review a suggestion that "a party claiming immunity from suit bears the burden of proof." *Ante* at 3686 (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)). I am uncertain what the majority means by its inclusion of this statement, nor do I see what relevance a burden of proof has in the motion to dismiss context (if,

indeed, the *Butz* decision was even announcing an assignment of burdens). As the majority would agree, once the defendant raises an absolute immunity defense by a motion to dismiss, we take all well pleaded factual allegations in the complaint as true and determine, on the basis of those well pleaded allegations and any reasonable inferences to be drawn therefrom, whether the defendant's actions fall within the scope of the immunity. The concept of "proof" has no role in this analysis.

tection from suit. *See Mara*, 855 F.2d at 789 (discussing the scope of prosecutorial immunity). This latter inquiry is organized around the concept of "functionality"—"we examine the nature of the functions with which a particular official or class of officials

4. The concept of "functionality" arose in the context of absolute immunity defenses against actions under 42 U.S.C. § 1983. I recognize that immunity doctrines in the § 1983/*Bivens* context differ somewhat from the immunity we apply to SROs such as NASDAQ. Immunities from suit under § 1983 arise as a matter of common law and statutory interpretation— § 1983 is interpreted not to have abrogated immunities that were traditional at common law. *Buckley*, 509 U.S. at 268-69, 113 S.Ct. at 2612-13. SRO immunity, on the other hand, derives from the sovereign immunity of the SEC as an agency of the federal government. *See Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 692 (5th Cir.1985).

Despite the distinct sources of immunity in each type of case, I believe—and the majority appears to assume, as well—that in practice, the functionality test is equally applicable in determining the scope of SRO immunity. *See, e.g., Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 58-59 (2d Cir.1996) (adopting the functionality analysis from the § 1983 context); *Austin*, 757 F.2d at 692 (same). Just as the functionality test in the § 1983 context is meant to identify that subset of activities performed by a governmental official for which immunity would have been available under common law, so in the SRO context does the functionality test illuminate the subset of an SRO's activities that are delegated from the SEC under the Exchange Act and thus subject to immunity.

Although none of my colleagues appears to disagree that the extent of SRO immunity is measured by functionality, I question certain aspects of both the majority's and Judge Pryor's discussions of the test. The majority analogizes the SRO immunity inquiry to a common law doctrine by which municipalities were immune from tort liability for "governmental" activities, but not "proprietary" activities. *See ante* at 3686-87 (citing *Owen v. City of Independence*, 445 U.S. 622, 645 n. 27, 100 S.Ct. 1398, 1412 n. 27, 63 L.Ed.2d 673 (1980)). Whether the governmental-proprietary model has any utility in the SRO context I do not know, but the majority's support for the proposition is unpersuasive. The majority quotes a footnote in *Owen*, which

has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."[4] *Forrester*, 484 U.S. at 224, 108 S.Ct. at 542.

itself quotes from a 1901 treatise. But as the *Owen* decision goes on to explain, the governmental-proprietary municipal immunity doctrine had for decades been restricted and largely repudiated, and in any event, it was not operative on the question before the Court. 445 U.S. at 644-47, 100 S.Ct. at 1412-13. In light of that context, without more, I am simply not sure whether the analogy is apt. In any event, I believe that such general terms as "governmental" are of little assistance, given as they are to variable interpretation.

Judge Pryor's explanation of the functionality analysis is even more fundamentally unsound. As he explains it, the court must determine whether the SRO's alleged conduct, as understood by "the reasonable reader" in its "alleged context," "advanced a delegated governmental function." *Ante* at 3690. Applying his test to the newspaper advertisement at issue in this case, Judge Pryor says that in the aftermath of Enron, "a reasonable reader of Weissman's complaint would understand the advertisement as a communication of the integrity and fidelity of the market," which is "part of the regulatory duties of NASDAQ . . . ." *Ante* at 3692.

I do not agree that a "reasonable reader" has anything to do with our determination of whether alleged SRO conduct falls within a protected category. Judge Pryor's analysis effectively renders meaningless the Supreme Court's admonition that the subjective motive or intent of the SRO is irrelevant. *Ante* at 3690. Although he acknowledges that "we must be careful not to allow our consideration of context to lead us to speculate about the motivations or intent of an SRO," *ante* at 3690, he then concludes that in the context of an advertisement for the NASDAQ-100 Index Trust, or QQQ, a "reasonable reader" could understand Weissman's "vague allegation that the advertisements 'feature[d]' WorldCom as describing conduct that touted WorldCom." *Ante* at 3692. Viewing the alleged conduct in its "alleged context" and "from the perspective of the reasonable reader" thus becomes tantamount to the back-door consideration of the SRO's alleged profit motive. But stripped of its irrelevant and conclusory trap-

3698     WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS

Absolute immunity questions can be difficult because of the factual specificity required in locating the boundaries of absolute immunity in relation to a specific government action; generalities are not helpful here. *See Burns*, 500 U.S. at 483 n. 2, 111 S.Ct. at 1938 n. 2 (observing that, while courts of appeals agreed generally on principles relevant to the scope of absolute prosecutorial immunity, they "have differed in where they draw the line between protected and unprotected activities"); *id.* at 495, 111 S.Ct. at 1944 (eschewing an overgeneralized characterization of actions in favor of an inquiry into whether the actions are "closely associated" with the protected category of activity); *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544 ("Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges."); *Marx*, 855 F.2d at 789 ("The dividing line is amorphous, and the process of determining on which side of the line particular kinds of conduct fall has proceeded on a case-by-case basis."). Courts have "never undertaken to articulate a precise and general definition of the class of acts entitled to immunity," instead evaluating functionality on a case-by-case basis. *See Forrester*, 484 U.S. at 227, 108 S.Ct. at 544.

Due to the specificity of the inquiry, we must be especially careful to look beyond any *characterizations* of the defendant's actions, however subtle, to identify the pertinent factual allegations setting forth those actions. *See Tenney v. Brandhove*, 341 U.S. 367, 376–77, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) ("The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a *conclusion of the pleader* ...." (emphasis added)); *cf. Schultea v. Wood*, 47 F.3d 1427, 1432 (5th Cir.1995) (en banc) ("[A] plaintiff cannot be allowed to rest on general characterizations, but must speak to the factual particulars of the alleged actions ...." (interpreting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))). For example, in *Burns v. Reed*, the Supreme Court considered a § 1983 complaint alleging that a state prosecutor "facilitated the issuance of a search warrant" and "deliberately misled the Court" by presenting to a court evidence that he knew to be false. 500 U.S. at 487–88, 111 S.Ct. at 1940. The *Burns* Court saw nothing in those allegations challenging any action that would fall outside the scope of functions for which the prosecutor is immune. *Id.* at 487, 111 S.Ct. at 1940. The Court disregarded the complaint's conclusory characterizations that the defendant "facilitated" or "misled," holding instead that the "[plaintiff] ha[d] challenged only [the prosecutor's] participation in the hearing," an activity for which he enjoyed immunity.[5] *Id.*

pings, the act about which Weissman complains—the mention of WorldCom as one of the 100 largest concerns on the exchange—pertains directly to the regulatory function of NASD and NASDAQ to make listing decisions, and the corollary duty to announce listing decisions to the public. *See infra* part II.

5.   In *Burns*, the district court had ruled on the absolute immunity defense at trial when it granted a directed verdict in favor of the remaining defendant. 500 U.S. at 483, 111 S.Ct. at 1937. With the benefit of the trial record, three dissent-

ing justices believed the plaintiff made out a claim that the prosecutor acted improperly by "approving the search warrant application," and the dissenters would have held that absolute immunity is not a defense with regard to such an action. *Id.* at 502, 504, 111 S.Ct. at 1948–49 (Scalia, J., dissenting in part); *but see id.* at 489 n. 5, 111 S.Ct. at 1941 n. 5 (rejecting the dissent's approach). Even the dissenters, however, agreed that such a claim was not apparent "if one looks solely to the complaint." *Id.* at 501–02, 111 S.Ct. at 1947.

Similarly, this court has rejected a plaintiff's conclusory allegations that a state prosecutor acted as an investigator, and thus was not immune, when he obtained and reviewed suspects' public driver's license records, inadvertently leading to the wrongful arrest of the plaintiff. *Rivera v. Leal*, 359 F.3d 1350, 1353–54 (11th Cir.2004). Although, on a surface level, the act of obtaining and examining records could be described as "investigatory," the court properly delved deeper to determine whether the prosecutor acted in his role as an "advocate for the State." *See id.* Under the circumstances—including, "most importantly," that the prosecutor obtained and reviewed the records in an effort to substantiate another individual's claim of innocence—the court held that the prosecutor's actions were taken in the interest of "effective judicial process," thus qualifying them for absolute immunity under the prosecutorial function. *Id.* Other decisions have similarly grappled with conclusions and characterizations in seeking to identify the facts underlying a complained-of action. *See Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir.1995) (determining that a legislative body's hiring decision was not legislative in nature, and thus not subject to immunity, because the action was directed at a "specific party," despite the fact that it was taken by a vote); *Ayrs v. Greenwald*, 21 F.3d 1111 (table), No. 93–55081 (9th Cir. Apr.12, 1994) ("[Plaintiff's] conclusory allegations that [the defendant judge] deliberately held back an order and tampered with court documents are insufficient to demonstrate that [the judge] acted outside his judicial capacity.") *Young v. Biggers*, 938 F.2d 565, 569 (5th Cir.1991) (affirming dismissal on immunity grounds in light of the plaintiff's "wholly unsupported and conclusory" allegations that a state prosecutor acted outside the prosecutorial scope by conspiring to interfere in a related civil suit); *cf. GJR Investments, Inc.*,

132 F.3d at 1370 (remanding for dismissal where the court "[could] find no sufficiently pled federal claims in the complaint that could serve to abrogate defendants' qualified immunity").

There can be no doubt that a motion to dismiss under Rule 12(b)(6) is a proper vehicle to defeat a complaint that, on its face, cannot overcome an immunity defense. *See Stump v. Sparkman*, 435 U.S. 349, 354–55, 98 S.Ct. 1099, 1103–04, 55 L.Ed.2d 331 (1978) (affirming dismissal on absolute immunity grounds); *Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976) (noting that absolute immunity "defeats a suit at the outset"); *Long*, 181 F.3d at 1279 ("Prosecutorial immunity may be asserted by a Rule 12(b)(6) motion, in which we ask if the allegations of the complaint disclose activities protected by absolute immunity."); *Marsh*, 268 F.3d at 1022 (en banc) ("A complaint is also subject to dismissal under Rule 12(b)(6) when its allegations—on their face—show that an affirmative defense bars recovery on the claim."). If the policy requiring early determination of immunity is to have any meaning, "liberal pleading" cannot be treated as some sort of mantra by which a plaintiff transcends the pesky business of a motion to dismiss. In its effort to strike a fair balance between plaintiffs' need for redress and a meaningful application of immunity defenses, this court has historically and consistently observed that a plaintiff must provide some factual allegation in his complaint that will serve to ward off a potential immunity defense; if he does not, the immunity is apparent from the face of the complaint and dismissal is appropriate under Rule 12(b)(6). *See, e.g., Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir.2003) (applying this circuit's heightened pleading requirement in § 1983 cases against government officials in their individual capacities);

**3700          WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

*More*, 855 F.2d at 788–89 (observing that, upon a Rule 12(b)(6) motion, the plaintiff is "tied … to the factual allegations of each claim in his complaint," leaving the court to decide whether those allegations "disclose activities protected by absolute immunity[.]   If they do, that is the end of the inquiry[.]").[6]

Nor does such a requirement overly burden the plaintiff or run afoul of Rule 8(a)'s pleading requirements.   In order for the plaintiff to satisfy his "obligation to provide the grounds of his entitle[ment] to relief," he must allege more than "labels and conclusions"; his complaint must include "[f]actual allegations [adequate] to raise a right to re-

lief above the speculative level." *Twombly*, 127 S.Ct. at 1964–65 (citations and internal quotations omitted).   Stated differently, the factual allegations in a complaint must "possess enough heft" plausibly to suggest that the plaintiff is entitled to relief. *Id.* at 1966; *see also id.* at 1970 (noting that "a few stray statements" are not enough).   Facts that are "merely consistent with" the plaintiff's legal theory will not suffice when, "without some further factual enhancement [they] stop short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Id.* at 1966.   In cases involving official or qualified immunity—whether of the § 1983 or SRO

---

6.   The use of the so-called "heightened pleading" requirement, though longstanding, continues to give rise to debate.   Our cases on this topic are perhaps not the model of clarity, but at the very least, this circuit applies a heightened pleading standard in complaints alleging § 1983 claims against entities who may raise qualified immunity as a defense (*e.g.*, government officials sued in their individual capacities). *Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir.2004).   Although I believe Weissman's complaint is due to be dismissed on absolute immunity grounds under even the basic Rule 8 pleading standard, I would suggest that our explicit heightened pleading requirement for some § 1983 suits might properly be applied in the SRO immunity context, as well.

A few words about heightened pleading may be helpful here.   The panel in *Swann* read the Supreme Court's decision in *Leatherman* as having abrogated two of our earlier decisions suggesting a broad application of the heightened pleading requirement in § 1983 cases. *Id.* at 836–37.   In describing the effect of *Leatherman* on our circuit's precedent, *Swann* purported to limit the application of heightened pleading to only those cases in which *qualified* immunity is a potential defense. *Id.* at 837.   To be sure, *Leatherman* abrogated our heightened pleading precedent to the extent that our cases applied the more stringent standard to claims against municipalities.   I do not believe, however, that *Leatherman* precludes the application of a heightened pleading requirement in absolute immunity cases.

First, I see nothing in *Leatherman* to suggest that the limitation on heightened pleading was

premised on the availability of *qualified* immunity in particular as a defense.   The Court held that heightened pleading could not be applied to claims against municipalities because they "do not enjoy immunity from suit—either absolute or qualified—under § 1983." 507 U.S. at 166, 113 S.Ct. at 1162.   Second, the decision of the Fifth Circuit cited by the *Leatherman* Court as having established the heightened pleading rule at issue was itself an absolute immunity case against individual government officers; as the Court noted, later decisions by the Fifth Circuit had extended the rule to suits against municipalities. *See id.* at 167, 113 S.Ct. at 1162–63 (citing *Elliott v. Perez*, 751 F.2d 1472, 1473 (5th Cir.1985)).   Third, neither *Swann* nor the two Eleventh Circuit cases purportedly overruled by *Swann* involved claims of absolute immunity, so any abrogation worked by *Leatherman/Swann* does not control the question.   Finally, I see no reason that the rationale for the heightened pleading requirement—"to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims"—applies any less to the narrow category of activities protected by absolute immunity. *See Arnold v. Bd. of Educ.*, 880 F.2d 305, 309 (11th Cir.1989).   If anything, absolute immunity requires even more of a concerted effort to resolve the defense on the basis of the pleadings, as its protections are for naught if discovery and trial are allowed. *See Brown v. Crawford County, Ga.*, 960 F.2d at 1010 n. 12.   As such, I would consider its extension beyond the § 1983 context to cases involving SRO immunity.

variety—the "grounds" for the plaintiff's claim will generally be an act or omission by the defendant, which the plaintiff alleges gave rise to his injury. As such, simply to state a claim on the merits, the plaintiff will have to allege some facts identifying the act complained of and suggesting that he is plausibly entitled to relief under some legal theory as a result. The factual allegations that identify the act in question will generally be the same facts that allow the court to identify whether the defendant is entitled to absolute immunity for the act. Thus, as a practical matter, an adequately stated claim should also ordinarily allow for a determination of absolute immunity at the pleading stage. Although I believe that the Supreme Court's recent statement in *Twombly* supports my view in this regard, the notion that a plaintiff will be practically bound to plead some facts relevant to immunity defenses is nothing new. *See GJR Invs., Inc.*, 132 F.3d at 1367 (holding that a plaintiff failed to pass the first part of the qualified immunity inquiry on an equal protection claim "even without the additional hurdle of the heightened pleading standard" where the complaint contained only "bare allegations" of dissimilar treatment); *More*, 855 F.2d at 789 n. 8 (observing that a Rule 12(b)(6) motion "operate[s] so as to require the plaintiff to allege facts which, if true, would show that the defendant acted outside the scope of absolute immunity").

The key, of course, is for the court to take the plaintiff at his word *only* with regard to his statement of actual facts, then consider any reasonable inferences from those facts. The court must not, however, cursorily review a complaint and accept, if perhaps inadvertently, the plaintiff's characterizations, which may be more or less subtle depending on the skill of the drafter, but will certainly be present.

## II.

The majority's disconcertingly brief treatment of Weissman's complaint here fails to account for any of the foregoing principles. After quoting several paragraphs of sketchy allegations from the complaint, the majority engages in a scant two paragraphs of wholly conclusory analysis.

Perhaps the majority felt it too onerous to parse Weissman's kitchen-sink complaint. Although Weissman does not commit the cardinal sin of "shotgun" pleading—incorporating each count's allegations into successive counts—his complaint is nonetheless rampant with conclusions, characterizations, and just plain "irrelevancies" that must be "sift[ed] out." *See Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir.2002). In total, Weissman takes thirty-seven pages comprised of 109 paragraphs to set out four relatively simple state law claims. In the first twenty-four pages, encompassing seventy-two numbered paragraphs, Weissman lays out his supposedly factual allegations common to all counts, replete with paragraph upon paragraph of quotations of everything from industry publications to NASDAQ rules to SEC filings—none of which bear in the least on his claims. Weissman's complaint, taken as a whole, ultimately boils down to a disapproval of NASDAQ's congressionally intended and SEC-approved hybrid nature as both a private, for-profit business and a quasi-governmental regulator. This becomes apparent early on, because before Weissman gets to any discussion of the advertisements at issue in this case, he goes on for pages setting up and complaining about the nature of NASDAQ. He describes actions and statements by the non-profit parent entity NASD and its officers allegedly revealing "a

**3702        WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

scheme to evade the letter and spirit of the strictures contained within its [non-profit] Certificate of Incorporation so they could participate like the executives of many Nasdaq listed companies who had become billionaires." Compl. ¶ 29. According to Weissman, the goal of this scheme was for NASD's officers to use their insider status to profit mightily from the conversion of the NASDAQ Stock Market into a for-profit, publically traded entity, giving them a "strong personal incentive to promote and sell Nasdaq traded securities." Compl. ¶ 43. He claims that "[t]he NASD, purely for the personal gain of its directors, officers and members, has created an institutionalized irreconcilable conflict of interest between its duty to protect the investing public and the stated goal of maximizing [NASDAQ's] revenue." Variations on the theme are carried throughout Weissman's four counts, as each contains some form of the allegation that the complained of advertisements were meant to increase listings and trading volume on NASDAQ, and thus the profits of its officers-shareholders.

Whether or not any of that is true, the immunity inquiry requires simply that we ascertain what acts by NASDAQ are alleged by Weissman to have caused his injuries, and whether those acts are among the functions for which NASDAQ must be immune. The majority begins its analysis by quoting heavily from three paragraphs of the complaint, the first of which consists of the conclusory allegation that NASDAQ "touted, marketed, advertised and promoted WorldCom, falsely representing it as a good company and worthwhile investment ... without revealing that, *inter alia:* ... WorldCom was not in compliance with Nasdaq listing requirements ...." *Ante* at 3688 (quoting Compl. ¶ 12). Here Weissman provides a glimpse of the true nature of his gripe: that NASDAQ's

judgment in the performance of its listing duty allegedly was clouded by its profit motive, causing it to continue listing WorldCom even after the company had fallen out of compliance with listing requirements. Of course, Weissman knew that he could not overcome immunity with such an allegation, which strikes directly at NASDAQ's decision-making with regard to listing and de-listing. For that reason, he took great pains at the outset of his complaint to state that "[t]his action is based solely on the for-profit commercial business activity of [NASDAQ] .... Plaintiff makes no claim based upon any failure of Defendants to fulfill any duties as a self regulatory organization ...." Compl. ¶ 6. Citing this language, the majority all too happily accepts Weissman's baseless disavowal of "any reliance on NASDAQ's regulatory activity as the basis for his suit," *ante* at 3684, apparently taking his word for it that NASDAQ's actions constituted touting, marketing, advertising and promotion and that such activities fall outside the functions for which NASDAQ ought to enjoy immunity. But neither the plaintiff's concept of the scope of immunity nor his pleading of generalities are determinative, so we must go further to isolate the particular relevant acts by NASDAQ alleged in the complaint.

The majority quotes nearly in full the two paragraphs containing Weissman's allegations about the television and newspaper advertisements. What do these paragraphs reveal about what NASDAQ allegedly did *as a matter of fact* to cause Weissman's injuries? Subtracting all the characterizations and glosses, Weissman's factual allegations about the television advertisements consists of this: NASDAQ ran advertisements for its own "100 Index Trust" product ("QQQ"), and the advertisements "featur[ed] a group of compa-

nies in the trust," including WorldCom.[7] Again boiling the allegations down to their core, Weissman complains about the newspaper advertisement as follows: NASDAQ ran an advertisement discussing certain of its listing criteria, and the advertisement listed the names and chief executives of certain companies traded on the exchange, including WorldCom. In both instances, it is the bare mention of WorldCom upon which Weissman seizes. He attempts to layer on all sorts of other general indications of promotion or "touting," but he never alleges any fact that would support even a generous inference that NASDAQ effectively communicated the message: "WorldCom specifically is a good investment. Buy it." The newspaper advertisement said nothing more about WorldCom

than that it was among the companies that met NASDAQ's listing criteria summarized in the ad. As for the television advertisements, the facts alleged by Weissman reveal only that the advertisements—while certainly promoting the QQQ product (an action about which Weissman does not complain)—mentioned that WorldCom was among the 100 largest market-capitalized companies on the exchange. That is all.

From Weissman's perspective as it relates to his alleged injury, the information he received about WorldCom from those advertisements was no different than what he could have learned by seeing WorldCom listed among the "Biggest 1,500 Stocks" in the Money and Investing section of the Wall Street Journal. I find it hard to imagine

---

7. The majority appears to have fallen for some pleading sleight-of-hand in its treatment of the complaint's paragraph 61, containing the television advertisement allegations. The first sentence of that paragraph reads: "In purchasing shares of WorldCom, Plaintiff relied on [NASDAQ's] advertising, which repetitively advertised WorldCom as a 'successful growth company.'" In the original complaint, after that sentence, Weissman included an "Id." citation, referencing a citation in the previous paragraph. The majority omits the "Id." citation in its reproduction of paragraph 61 in the opinion, apparently thinking it unnecessary.

Weissman's "Id.", however, is telling. The citation refers to quoted language in the complaint's previous paragraph from a 2001 SEC registration statement filed by NASDAQ discussing its "branding strategy" and featuring the phrase "successful growth companies." That SEC statement, and Weissman's accompanying allegations that NASDAQ was engaged in an expensive marketing campaign, are of course irrelevant to the question of whether NASDAQ is immune for the specific television advertisements in question. Nor does Weissman anywhere allege that he was aware of and relied upon NASDAQ's SEC statement to his detriment in purchasing WorldCom stock. He does, however, appear to rely on the information he presumably later learned from the SEC statement about NASDAQ's "branding strategy" when he implies (without directly stating) that the "key message"

of the television advertisements was "that the world's most successful, sought after companies, can be found on the Nasdaq stock market."

As I read this portion of the complaint, I think it apparent that Weissman is characterizing the advertisements in hindsight. His allegations in paragraph 61 are obviously framed in light of the information in the SEC statement, which he explicitly references. Weissman simply juxtaposes his flimsy factual assertions about the specific QQQ television advertisements with his vague allegations that NASDAQ was promoting the notion of "successful growth companies" as a "branding strategy" for the exchange as a whole. In doing so, he hopes that the courts will be swayed—as the majority has been—by the ultimately irrelevant inference that NASDAQ was profit-seeking. The majority apparently follows Weissman down the primrose path to a conclusion that because NASDAQ was allegedly engaged in an advertising campaign to enhance its profits, and because it advertised its QQQ product, and because the QQQ advertisements mentioned WorldCom, that necessarily means that the advertisements promoted the sale of WorldCom specifically. I do not think this inference is reasonable in light of the few bare facts contained in paragraph 61. Such post-hoc characterizations can have no bearing on our determination of whether NASDAQ is entitled to immunity.

**3704**      **WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS**

that the majority would require NASDAQ to answer suit for causing such information to be published, yet that hypothetical case, like the instant case, involves communication of the fact that a given company is listed on the exchange (thus ostensibly meeting the listing criteria) and happens to be a large company. *Cf. Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir.1998) (citation omitted) (affirming dismissal on absolute immunity grounds and observing that the very "[i]nclusion of an issue in NASDAQ creates the public expectation that the company meets minimum financial criteria, as well as embracing 'integrity and ethical business practices.'"). SRO immunity is worthless if it does not extend so far as to cover the SRO's public announcements—in whatever form they may take—of what are ultimately its quintessentially regulatory functions. *DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*, 409 F.3d 93, 98 (2d Cir.2005) ("[W]ithout the capacity to make announcements, [SROs] would be stripped of a critical and necessary part of their regulatory powers—namely, the power to inform the public of those actions it has undertaken in the interest of maintaining a fair and orderly market or protecting investors and the public interest." (citations omitted)).

The situation would be helped if the majority articulated any relevant principles guiding its analysis. But after the majority asserts that it will "look to the nature and function of NASDAQ's actions as alleged," it essentially papers over the need for careful examination of the factual allegations, saying only, "We can find no quasi-governmental function

served by the advertisements here. The allegations do not relate to NASDAQ's statutorily delegated responsibilit[ies]." *Ante* at 3689. It then emphasizes NASDAQ's nature as a "private corporation" engaged in "private business activity," including specifically "advertising," that is meant to "entice[ ] investors" and "increase trading volume and, as a result, company profits." *Ante* at 3689. To the extent that these hints suggest its reasoning, the majority misses the mark. The "private" identity of NASDAQ is irrelevant because the very nature of a self-regulatory organization, as envisioned by Congress in the Securities Exchange Act and supervised by the SEC, is one of a private entity performing a public, quasi-governmental regulatory function over its own business operations. *See* 15 U.S.C. § 78o–3(b);[8] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 128–29, 94 S.Ct. 383, 390, 38 L.Ed.2d 348 (1973) (noting that "[s]upervised self-regulation" is "consonant with the traditional private governance of exchanges"); *cf. Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988) ("[I]t [is] the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis."). Congress made a reasoned choice in opting not to supplant exchange self-regulation with wholly governmental oversight, but rather to allow the exchanges to continue in their private business while also enlisting them into public service. *See Merrill Lynch*, 414 U.S. at 128 n. 9, 94 S.Ct. at 390 n. 9.

---

**8.**   In relevant part, the Act provides:

   An association of brokers and dealers shall not be registered as a national securities association [which is, by definition, an SRO] unless the [Securities and Exchange] Commission determines that ... [t]he rules of the association are designed to prevent fraudulent and manip-

ulative acts and practices, to promote just and equitable principles of trade, ... to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest ....

15 U.S.C. § 78o–3(b), (b)(6).

WEISSMAN v. NATIONAL ASS'N OF SECURITIES DEALERS     3705

Moreover, the majority is obviously swayed by its perception that NASDAQ was acting with a profit motive in allegedly trying to increase trading—this despite the majority's earlier correct observation that "[t]he test is not an SRO's subjective intent or motivation . . . ." *Ante* at 3687 (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)); *see also DL Capital Group, LLC*, 409 F.3d at 99. In the SRO context especially, it could not be any other way, as many of an SRO's regulatory duties result in the SRO making money. For example, in order to be listed on the exchange, a company has to pay listing fees. Thus, NASDAQ makes money from listing, and access to a listing determination by NASDAQ is predicated on payment by the company. But no one, including the majority, would dispute that a listing decision is the archetypal quasi-governmental activity for which an SRO enjoys immunity from suit. Thus, the simple fact that an SRO makes money from an activity does not determine the extent of immunity protection for that activity.

By granting too much credence to Weissman's profit-motive theory of the case, the majority unduly constricts the scope of an SRO's absolute immunity for what are quintessentially regulatory functions. I believe such cursory acceptance of a plaintiff's allegations to be unsupported and ill-advised, as it will necessarily chill an SRO's ability to communicate with the marketplace. Absolute immunity must be given "to the extent necessary to permit the proper functioning of the regulatory system." *Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 687 (5th Cir. 1985). How is the self-regulatory system to function properly if the SRO must fear ever mentioning the name of a company, lest that act later be characterized as promotional? Absolute immunity is meant to prevent exactly this sort of interference in the performance of critical governmental (or in this case, quasi-governmental) functions. *See Forrester*, 484 U.S. at 226–27, 108 S.Ct. at 544 (noting that, in the wake of an "avalanche of lawsuits, most of them frivolous but vexatious," the government entity's "resulting timidity would be hard to detect or control, and it would manifestly detract from" the robust performance of its regulatory functions).

As the majority has given no convincing support for its result, I am not sure what is accomplished by its opinion, other than achieving the end of returning Weissman to the district court, where he can continue his quixotic adventure to make someone—anyone—pay for his unfortunate investment. I would reverse the district court's denial of absolute immunity with regard to all of the advertisements.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:_____
Deputy Clerk
Atlanta, Georgia

U.S. Court of Appeals, Eleventh Circuit—Thomson/West. Saint Paul, Minn.